**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 21-cr-429-CRC** |
| | : | |
| **NOLAN KIDD,** | : | |
| | : | |
| Defendant. | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Nolan Harold Kidd ("Kidd") to ninety days' imprisonment, followed by three years' probation, 60 hours of community service, and $500 restitution.

## I.      Introduction

The defendant, Nolan Harold Kidd, and his friend, Savannah Danielle McDonald ("McDonald") (Case No. 21-cr-429 (CRC)),[1] participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' in losses.[2]

---

[1] McDonald is scheduled to be sentenced by this Court on May 10, 2022.

[2] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On February 7, 2022, Kidd pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.  As explained herein, a sentence of ninety days' imprisonment, with probation to follow, is appropriate in this case because Kidd: (1) observed, filmed and cheered when a mob of rioters swarmed through a police line on the Upper West Terrace Staircase before he entered the Capitol Building; (2) entered the Capitol Building despite having been sprayed with tear gas three times by police officers; (3) was part of the first group of rioters to enter the Capitol Building on January 6, and entered through the Senate Fire Door less than 20 seconds after it was opened by other rioters; (4) spent approximately 40 minutes inside the Capitol Building; (5) gave an interview shortly after exiting the Capitol Building and sent messages on social media that displayed a total lack of remorse, including referring to himself as a "stormtrooper" and bragging that he "went farther than almost anyone into the building;" and (6) subsequently tried to hide evidence of his participation in the riot because the "FBI are trying to identify anyone that got inside," and he also provided false or misleading information to law enforcement officials about the riot.

The Court must also consider that Kidd's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers, breach the Capitol, and disrupt the certification proceedings. But for his actions alongside so many others, the riot likely would have failed to disrupt the certification proceedings. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, Kidd's participation in a riot that actually succeeded in halting the Congressional certification combined with his celebration and endorsement of the violence on that day, his lack of remorse as

demonstrated in social media posts and an interview, and his attempt to hide evidence or downplay his role in the riot renders a ninety-day jail sentence appropriate in this case.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 44 (Statement of Offense), at ¶ 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Kidd's conduct and behavior on January 6.

### Kidd's Role in the January 6, 2021 Attack on the Capitol

On January 4, 2021, Kidd and McDonald left their homes in Georgia to travel to Washington D.C. to attend the "Stop the Steal" rally. After attending the rally, Kidd and McDonald joined the crowd advancing on the U.S. Capitol. A photo of Kidd and McDonald, taken from inside the Capitol Building and found on Kidd's mobile telephone, is included below as Exhibit 1. As seen in Exhibit 1, on the day of the riot McDonald wore a black jacket and red beanie, while Kidd wore a dark jacket with two stripes over a red sweatshirt. Kidd is also wearing a United States Capitol Police (USCP) hat that he took during the riot and is holding a red Make America Great Again hat that he wore during most of the riot.



Exhibit 1.

After reaching the Capitol Grounds, Kidd and McDonald watched from the West Lawn while rioters overran a police line and rushed up the stairs of the U.S. Capitol. Kidd recorded the moment on his mobile telephone and can be heard shouting "this has never happened before, they just broke through, the police had to retreat, they just broke the line" while in the background McDonald yelled "we are making history!" *See* Exhibit 2. A still image from the video is included below as Exhibit 2-1.



Exhibit 2-1.

Closed Circuit Video (CCV) provided by USCP captured the moment rioters broke through the police line from a different angle. *See* Exhibit 3. Rioters first pelted the police officers with a variety of objects and then pushed through the line 48 seconds into the video. Kidd and McDonald then climbed up the same staircase and crossed the line approximately four minutes later.  Due to a technical issue with the relevant USCP CCV camera, the images in the recording blur around the time the Kidd and McDonald cross.  However, McDonald can be seen in a still image from the video, included below as Exhibit 3-1, and Kidd's striped leather jacket is visible just in front of her, both circled in red.



Exhibit 3-1.

Kidd also took a video as he climbed the staircase with McDonald past where the police line had been breached. *See* Exhibit 4. In the video, Kidd narrates their movements, stating "we broke through the line, policemen shooting, tear gassing, but we got it, we got it, we're in." A still image from the video is included below as Exhibit 4-1.



Exhibit 4-1.

As Kidd and McDonald moved on to the Upper West Terrace, they watched and recorded as rioters entered through the Senate Wing Door and adjacent windows, the first breach of the Capitol Building. Contrary to any claims that the doors were open to the rioters or that police let the rioters in, Kidd can be heard in the video yelling "they broke all the way through the door… they're goin' in, look … you want to."  *See* Exhibit 5.  A still image from the video is included below as Exhibit 5-1.



Exhibit 5-1.

The initial breach at the Senate Wing Door and adjacent windows was also recorded by USCP CCV from inside the Capitol. A still image of the breach is provided below as Exhibit 6. The doors were subsequently forced open by rioters at 2:13:30 p.m.



Exhibit 6.

This breach was also captured from the outside by USCP CCV. *See* Exhibit 7. At 2:15:20 p.m., approximately 3:20 into Exhibit 7, Kidd and McDonald can be seen heading towards the entrance at the Senate Wing Door.  In the still image included below as Exhibit 7-1, Kidd and McDonald are circled and red, and there is an arrow pointed at the Senate Fire Door entrance to the Capitol Building, which is closed.



Exhibit 7-1.

At approximately 2:16 p.m., two rioters who had entered through the Senate Wing Door broke open the Senate Fire Door from the inside. As captured in USCP CCV video, Kidd and McDonald entered the Capitol Building through the Senate Fire Door less than 20 seconds after the door was opened. *See* Exhibit 8; *see also* Exhibit 7 (the Senate Fire Door is forced open approximately 4 minutes into the video). Due to a technical issue with the USCP CCV camera, the images begin to blur around 1 minute into Exhibit 8. However, in a still image taken from the video, included below as Exhibit 8-1, Kidd and McDonald (circled in red) are visible just after they entered the Capitol. Additionally, approximately 30 seconds later, police officers can be seen securing the Senate Fire Door and forcing rioters to exit. *See* Exhibit 8.



Exhibit 8-1.

After breaking into the Capitol Building, Kidd and McDonald remained inside "for approximately 40 minutes walking through various areas inside, including walking past the Senate Carriage Doors and taking the elevator to the third floor." *See* ECF 44 at ¶ 9. Once again, Kidd

filmed and narrated their movements. Immediately after entering the building, and in apparent acknowledgment that they had no right to be there, Kidd yelled, "this is the place very few Americans ever get to see, we broke in, we own this building, this is our house, they can tear gas us all they want, we own it." *See* Exhibit 9. Kidd next recorded as they approached the Senate Carriage Door, and a rioter can be heard asking "why are they directing us" as officers try to move rioters toward the door. *See* Exhibit 10. When Kidd realized that they were being led out of the Capitol Building, Kidd said "it goes outside, turn around" and yelled at the crowd to "turn it around." *Id*. A still image from that video is included below as Exhibit 10-1.



Exhibit 10-1.

USCP CCV footage also captured the moment that Kidd and McDonald refused to exit the Senate Carriage Door. *See* Exhibit 11. Officers can be seen directing rioters to exit the Capitol, and some of the other rioters exited through the Senate Carriage Door. Instead of following the directions of the police officers, they turned around, but ran into another police line had formed at the intersection with the next corridor. Rather than exiting the building as directed, Kidd and McDonald snuck onto an elevator and traveled up to the third floor. In a video entitled "Storming the Capitol," which is available at https://www.youtube.com/watch?v=LeRYX4LOzYw, Kidd and McDonald gave an interview to the Young Patriots Society shortly after exiting the building (YPS Video).[3] At 7:50 in the YPS Video, Kidd stated that they entered an elevator because law enforcement had "a hall blocked off pretty early on." A still image from the USCP CCV footage is included below as Exhibit 11-1, with Kidd and McDonald circled in red.



Exhibit 11-1.

---

[3] In the about section of the YPS News page on Youtube, which is available at https://www.youtube.com/channel/UCrTNne5uzmnDP4_caxzwzNg/about, the group describes itself as "a group of independent journalists documenting political events and protests in Philadelphia, NYC, DC, and beyond."

After taking an elevator to the third floor of the Capitol Building, Kidd and McDonald were again directed to leave by a police officer. *See* Exhibit 12. However, Kidd and McDonald did not exit the building, and instead walked down only one flight of stairs. On the second floor, Kidd and McDonald stood and sat near another police line in the second-floor hallway for approximately 30 minutes. *See* ECF 44 at ¶ 9. In some of the iconic photos taken during the January 6 riot, included below as Exhibits 13-1, 13-2 and 13-3, Kidd and McDonald (marked with red boxes) can be seen flanking the "Q Shaman" as rioters are held up in the hallway by a line of police officers.



Exhibit 13-1.[4]

---

[4] https://www.businessinsider.com/q-shaman-qanon-influencer-capitol-siege-washington-dc-protest-riot-2021-1



Exhibit 13-2.[5]



Exhibit 13-3.[6]

During this time-period Kidd recorded several more videos. In one, Kidd mocked police

officers for saying the Capitol had been shut down due to COVID concerns, while McDonald

---

[5] https://www.insider.com/judge-orders-dc-jail-qanon-shaman-organic-food-jacob-chansley-2021-2

[6] https://www.washingtonpost.com/nation/2021/01/15/qanon-shaman-trump-kill-pardon/

recorded a video bragging about having been tear gassed three times. *See* Exhibit 14. In another video, Kidd and McDonald bragged that McDonald was "the only girl who made it into the Senate." *See* Exhibit 15. A still image from another, shorter video is included below as Exhibit 16.



Exhibit 16.

While waiting in the hallway, Kidd picked up a USCP hat from the ground. *See* Exhibit 1. At approximately 2:53 p.m., the rioters in the area were directed to leave by law enforcement. Kidd and McDonald walked downstairs to the first floor, and subsequently exited the Capitol Building through the Senate Carriage Doors at approximately 2:55 p.m. However, Kidd and McDonald did not exit the Capitol Grounds at that time. Instead, they walked to the Eastern side of the Capitol, where they recorded additional videos and agreed to do an interview. *See supra* at 11. During the interview, at 7:11 in the YPS Video, McDonald bragged that they were "definitely in the first 100 to 150 people" to make it inside the Capitol. Additionally, the interview is spliced together with

video clips taken by Kidd, and the YouTube page states that "Videos inside Capitol courtesy of Nolan Kidd." The interview ended with Kidd placing the USCP hat on his head while bragging that he got a souvenir from the riot.

Kidd also shared his videos from the riot on social media and made comments regarding his participation in the riot. For example, on January 7, 2021, "Kidd sent via private message photographs of him and McDonald inside of the U.S. Capitol." ECF 44 at ¶ 12. Kidd also commented in a Facebook message, "I'll put it like this, people had the police riot shields, vests, and I got my hands on one of the officer hats and I have someone from Texas mailing me a riot helmet." *Id*. On January 7, in the below Snapchat conversation, Kidd (XXXX74) bragged that he "and Savannah are FUCKING STORMTROOPERS" and "went farther than almost anyone into the building … Maybe top 15 people."

| XXXX74 | Me and Savannah are FUCKING STORMTROOPERS | Thu Jan 07 02:50:03 UTC 2021 |
| XXXXXX | Hellll yeaaaaa | Thu Jan 07 00:22:48 UTC 2021 |
| XXXX74 | Maybe about top 15 people | Thu Jan 07 00:22:43 UTC 2021 |
| XXXX74 | We werenâ€™t just there%2C we went farther than almost anyone into the building | Thu Jan 07 00:22:37 UTC 2021 |

In an interview conducted pursuant to the plea agreement on April 20, 2022, Kidd explained that his comment was a reference to a Times of India post from January 6, 2021, that was also shared in the chat, and is included below as Exhibit 17. Kidd also stated that his use of the term stormtrooper was intended as a joke.



Exhibit 17.

While Kidd did not express any remorse over his conduct during or immediately after the riot, he subsequently realized that he might be legally culpable for his conduct. Based on private messages from Kidd's Facebook account, it appears that Kidd removed publicly posted pictures of his involvement in the riot from Facebook. On January 7, 2021, he was asked "Why did you remove your pics?" ECF 44 at ¶ 13. Kidd responded, "The FBI are trying to identify anyone that got inside and press charges." *Id*. Following that message, Kidd still shared the same January 6 photos on Facebook, he just did so privately, responding "Yeah I'll send the stuff to you though just don't put me lol."

*Law Enforcement Interviews*

Kidd was voluntarily interviewed by FBI agents on January 15, 2021, and admitted to deleting some of his posts about the riot from Facebook.[7] During the January 15, 2021 interview,

---

[7] In an interview conducted pursuant to the plea agreement on April 20, 2022, Kidd further explained that he does not specifically recollect deleting any comments from Facebook, but acknowledged removing all publicly available photos or videos taken on January 6.

Kidd claimed to have been one of the first 100 people to have entered the Capitol Building, despite having been teargassed three times before entering the Capitol. *Id*. at ¶ 12. Kidd also told the FBI that he did not break into the Capitol because the doors were "wide open" when he got to the Capitol. In an interview conducted pursuant to the plea agreement on April 20, 2022, Kidd once again stated that the doors to the Capitol were wide open. These statements inaccurately downplay Kidd's conduct on January 6. Kidd and McDonald were on the Upper West Terrace by 2:15 p.m., less than two minutes after the initial breach of the Senate Wing Door. In his own recording, the broken-out windows on either side of the door are visible, and Kidd exclaims "they broke all the way through the door." *See* Exhibit 5. And, as Kidd and McDonald began moving toward the Senate Wing Door at the end of the video, the Senate Fire Door was still closed. *Id*. When rioters finally broke open the Senate Fire Door and waved at other rioters to join them, Kidd and McDonald entered through the door in less than 20 seconds. *See* Exhibit 7. Although the Government has uncovered no evidence that Kidd personally broke any doors or windows, which is why he is not charged with destruction of property, his claim that the doors to the Capitol were wide open, if not demonstrably false, is clearly misleading.

*The Charges and Plea Agreement*

On May 20, 2021, Kidd was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2); and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On June 11, 2021, he was arrested in Georgia. On June 24, 2021, Kidd was charged by four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On February 7, 2022, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building. By plea agreement, Kidd agreed to pay $500 in restitution to the Department of the Treasury.

### III.     Statutory Penalties

Kidd now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Kidd faces up to six months of imprisonment and a fine of up to $5,000. Kidd must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so

under the most extreme of circumstances. Here, Kidd has admitted to being tear gassed multiple times before entering the Capitol Building. *See* ECF 44 at ¶ 11. As depicted in Exhibits 1-7, before entering the Capitol Building, Kidd watched, recorded, and cheered as other rioters assaulted police, broke through a police line, and broke into the Capitol. He even described his own conduct as breaking in. Clearly, Kidd knew he was violating the law when he entered the Capitol Building. While no one who participated in the January 6 riot can plausibly claim to have been a tourist, Kidd is certainly not among the least culpable of the rioters.

Additionally, while looking at Kidd's individual conduct and determining a fair and just sentence, this Court should look to a spectrum of aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Kidd personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of Kidd is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Kidd from most other misdemeanor defendants. However, what

does distinguish Kidd from most other defendants is the atypically high number of aggravating factors.

Although Kidd did not personally engage in violence, Kidd certainly observed violence before entering the Capitol Building. He watched as a mob of rioters assaulted police officers with thrown objects, and cheered as the mob suddenly pushed through the line. He saw the destruction of property as rioters forced open a door and climbed through windows. And, all of this conduct occurred after Kidd had already been tear gassed by police officers three times. As part of the first group to enter the Capitol, he would have crossed through numerous barriers and barricades on his way to the Capitol Building.

Additionally, once inside the Capitol building, he ignored the directions of law enforcement, refusing to exit at the Senate Carriage Door, and then sneaking onto an elevator when trapped behind a new police line. And, while Kidd left the third floor when directed to do so by an officer, Kidd walked down only one flight of stairs and spent another 25 minutes inside the Capitol. Altogether Kidd spent 40 minutes inside the Capitol Building. His presence, along with the other rioters, had the desired effect of delaying the certification vote. He even took a USCP hat as a trophy of his illegal conduct.

Finally, Kidd hid evidence after the riot, and tried to downplay his unlawful conduct to investigators. Indeed, Kidd has admitted to deleting public Facebook posts following the riot, while continuing to privately share his videos via social media. And, when interviewed by the FBI, he mislead investigators by claiming that the doors to the Capitol Building were standing wide open.  His own recordings prove that he watched rioters climbing through the broken-out windows adjacent to the Senate Wing Door, and that the Senate Fire Door was still closed when he decided

to enter the Capitol. USCP CCV also proves that Kidd entered through the Senate Fire Door less than 20 seconds after rioters broke it open.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Kidd's History and Characteristics

As set forth in the PSR, Kidd is a 22-year-old male who was born and resides in Georgia. PSR at ¶¶ 41 and 48. Kidd is a high school graduate and attended one semester of technical college. PSR at ¶¶ 61-62. Kidd is currently employed as a shipping/packing manager. PSR at ¶ 65. Kidd has no prior criminal convictions. PSR at ¶ 34.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[8] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

---

[8] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

**D.  The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be

22

deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Kidd's conduct on January 6, 2021, and boastful claims following the riot, demonstrate the need for specific deterrence for this defendant. Kidd had received the clearest direction possible that he was trespassing, having been tear gassed by police officers three times, but still persisted in entering the Capitol Building. Also, before entering the Capitol, Kidd watched, filmed, and cheered on the assault of law enforcement officers trying to hold the line on the Upper West Terrace Staircase, crowing "this has never happened before, they just broke through, the police had to retreat, they just broke the line." While inside the Capitol, Kidd directed other rioters to ignore the direction of law enforcement, shouting "turn it around," and bragged about breaking in, yelling, "we broke in, we own this building, this is our house, they can tear gas us all they want, we own it." After 40 minutes inside the Capitol Building, he continued to express pride and excitement over his conduct.  While still on Capitol grounds Kidd gave an interview where he bragged about having made it inside the Capitol and flaunted the USCP hat. Kidd also provided his videos from that day to the interviewer so that they could be made publicly available. Even the day after the riot, after he had a chance to reflect on the enormity of what had transpired, he demonstrated no recognition of wrongdoing. Instead, he reveled in being called a stormtrooper and

claimed he was among the top 15 people who went inside the Capitol. He even bragged to the FBI that he was one of the first 100 people to make it into the Capitol Building.

The government acknowledges that Kidd has now accepted responsibility early by entering into this plea agreement and complied with the terms of that agreement by participating in an interview on April 20, 2022. Additionally, the Government notes that Kidd has now turned over to the FBI the USCP hat he took from the Capitol during the riot, which the Government believes is a sign of remorse. However, his actions during and immediately following the riot on January 6 underscores the need for specific deterrence in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[9] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[10] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr.

---

[9] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[10] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in

6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, such as Kidd, merit serious consideration of incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Kidd has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

---

this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the exact same balance of aggravating and mitigating factors present here, the Court may consider the sentence of Jennifer Ryan (No. 1:21-cr-00050 (CRC)), who pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G). Like Kidd, Ryan

gave public interviews celebrating her involvement in the riot. Like Kidd, Ryan also recorded videos where she encouraged and directed other rioters, or otherwise celebrated breaking into the Capitol. Of course, there are differences as well. Kidd spent substantially more time actually inside the Capitol, and, while inside the Capitol, Kidd disobeyed the directions of police officers to exit the Capitol. Unlike Ryan, Kidd took a USCP hat as a trophy from the riot, and subsequently tried to hide evidence about his participation in the riot. Kidd was also part of the first wave to enter the Capitol Building, and bragged about how far he went into the Capitol and his status as one of the first group of rioters to enter the Capitol. On the other hand, Ryan had a much larger social media presence and appeared to actively call for violence during the riot. Ryan also continued to make comments well after the riot that indicated she did not feel remorse. This court ultimately sentenced Ryan to two months' jail time.

By way of contrast, this Court may want to consider the sentence of 36 months' probation given to John Clarence Wilkerson IV (Case No. 1:21-cr-00302 (CRC)). Wilkerson was sentenced for walking past barricades, watching rioters engage police at a police line, entering the Capitol approximately eight minutes after the Senate Wing Door was breached, and staying inside the Capitol Building for approximately fourteen minutes. While there are some similarities in conduct, Kidd has many more aggravating factors. For example, while both Kidd and Wilkerson saw rioters assault police, Kidd recorded and cheered that assault. Kidd also spent almost three times as long as Wilkerson inside the Capitol Building, refused to obey the directions of police officers to leave the Capitol, and took a USCP hat home with him as a trophy. While they both posted on social media, Kidd publicly shared the videos he took inside the Capitol, and also gave an interview from the Capitol Grounds. Additionally, unlike Wilkerson, Kidd subsequently tried to hide evidence

and provided misleading statements to law enforcement officers investigating his participation in the riot.

Similarly, this Court may want to consider the sentence of 14 days' incarceration given to Anthony Scirica (Case No. 1:21-cr-00457 (CRC)). Both Kidd and Scirica were inside the Capitol for over 30 minutes and appear to have given direction to other rioters: Kidd told rioters to "turn it around" rather than exit at the Senate Carriage Door while Scirica directed rioters toward Statuary Hall. Kidd and Scirica also both observed rioters pushing against police officers. However, Kidd observed violence against officers, and was tear gassed three times, before he entered the Capitol Building, while Scirica did not observe violence until he was already inside. Additionally, while Scirica took several videos on January 6, including one where he chanted U-S-A, in Kidd's recordings he cheered the assaults on police and made statements like "we broke in, we own this building, this is our house, they can tear gas us all they want, we own it." Kidd also refused to obey the directions of police officers to leave the Capitol, took a USCP hat home as a trophy, gave an interview from the Capitol Grounds, and subsequently tried to hide evidence and provided misleading statements to law enforcement officers.

The Court may also wish to consider the related cases of Erik Rau (Case No. 1:21-cr-00467(JEB)) and Derek Jancart (Case No. 1:21-cr-00148(JEB)). Both individuals pleaded guilty before Judge James E. Boasberg to 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in the Capitol Building. Like Kidd, Rau and Jancart appeared to be ecstatic about being involved in the riot, and were recorded shouting, "we made it up to the Capitol … we have the police surrounded!  We have you surrounded!"  *United States v. Rau*, 1:21-cr-00467 (JEB), ECF 13 at 3-4. Like Kidd, Rau may have intentionally destroyed evidence, as Rau deleted texts from his phone that the FBI recovered through other means. Rau and Jancart also appear to have been in the Capitol Building for about

the same time as Kidd. Judge Boasberg sentenced both Rau and Jancart to 45 days of imprisonment.

More generally, the United States has recommended, and judges have often imposed, jail time in cases where the defendant witnessed confrontations with law enforcement before entering the Capitol or refused to follow the directions of law enforcement. *See, e.g.*, *United States v. Register*, 1:21-cr-00349 (TJK) (receiving 75 days incarceration where the defendant waved the crowd towards an access point, entered the U.S. Capitol past broken windows, ignored officers' attempts to clear him and others from the building, and witnessed violence); *United States v. Frank Scavo*, 1:21-cr-254 (RCL) (receiving 60 days' incarceration where the defendant witnessed the violent breach of the East Rotunda Doors); *United States v. James Little*, 1:21-cr-315 (RCL) (receiving 60 days' incarceration and 36 months' probation where the defendant witnessed rioters clashing with police officers on the Capitol Grounds); *United States v. William Tryon*, 1:21-cr-00420 (RBW) (receiving 50 days incarceration where the defendant initially disregarded directions by police officers and remained inside the Capitol until he was forced to leave).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing a split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. Apr. 21, 2022) (imposing a split sentence).

### A.  A sentence imposed for a petty offense may include both incarceration and probation.

#### 1.  *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).   Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing

court may impose a term of continuous incarceration that exceeds two weeks[11] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[12] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

---

[11] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3563(b)(10). *See* Part II *infra*.

[12] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense."  H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

### 2.  *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1,

Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term

of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense."  *See Little*, 2022 WL 768685, at \*5-\*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense").  Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense."  The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense."  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012).  Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited."  *Id.* at 148-49.  And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."  *See Little*, 2022 WL

768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense).  When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b).  *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one.").  As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3).  That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases.  Scalia & Garner, *supra*, at 184.  In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart

from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two

offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  The defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

**B.  A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

### 1.  *Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563.  Among the discretionary conditions of probation a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[13]

### A.  Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time."  18 U.S.C. § 3563(b)(10).  Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix

---

[13] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[14]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes a imprisonment as a term of probation in the defendant's case given the requested 20-day imprisonment sentence.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Nolan Kidd to ninety days' incarceration, three years' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and

---

[14] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while

recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:      /s/ *Benjamin Kringer*
Benjamin E. Kringer
Detailed to the U.S. Attorney's Office
for the District of Columbia
D.C. Bar No. 482852
555 Fourth Street, N.W.
Washington, DC  20530
benjamin.kringer2@usdoj.gov
(202) 598-0687